Case No. 24 that serves NCC et al. Vermont Information Processing, Inc. Petitioner v. National Labor Relations Board. Steve Ellis, Petitioner v. Saunders, for the response. Good morning. Good morning, Your Honors. May it please the Court? I think I've reserved two minutes for rebuttal. I'm Steve Ellis. I represent Vermont Information Processing. We're appealing a decision of the National Labor Relations Board that was issued on November 5th of 2024. It relates to the termination by my client of four software developers. Mr. Bendell was terminated on February 16th of 2021. The other three, Mr. Dragoon, Mr. Swift, and Mr. Noble, were terminated two days later on February 18th, 2021. I'd like to focus on two or three issues which potentially moot all of the other issues that have been raised in the briefs. And the first is the issue of uncharged conduct. The General Counsel's complaint alleged that my client, VIP, fired all four of the charging parties because they, quote, engaged in concerted activities with each other and with other employees for the purposes of mutual aid and protection by creating and disseminating a spreadsheet where employees could view and share salary information. But, Your Honors, neither the ALJ nor the Board found that Mr. Dragoon, Swift, or Mr. Noble were fired for that reason. The ALJ found and the Board affirmed that those three were fired for their chat communications on a VIP work platform after the spreadsheet had been created and disseminated. General Counsel never moved to amend the complaint either before, during, or after the ALJ hearing to charge that these chat communications were concerted protected activity or that firing those three for those chat communications violated the Act. This theory appeared for the first time in the ALJ's decision itself, and that's at Joint Appendix 1739. VIP argued to the Board that the ALJ's finding of a violation that was not charged or litigated violated VIP's due process rights. The Board's decision doesn't address that argument at all, and this is a very fundamental constitutional problem. This Court has repeatedly held we cannot affirm a decision made without a reasoned explanation. Without a reasoned explanation, it's impossible to determine whether the decision is supported by substantial evidence. This is a standard that it is well settled that the Board may find and remedy a violation even in the absence of a specified allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated. And it seems to me that what the ALJ did, it was closely connected because it relied on the chat that was closely related to the spreadsheet and Bendel's firing, which allegedly was because of the spreadsheet. But I think what is a little bit more problematic for the Board is that the NLRB cited workplace conditions, and I'm not clear on how that is something that was closely connected and fully litigated. Well, I'd like to get to that in a moment, Your Honor. But the problem is the Board didn't address this constitutional due process argument at all. And this Court has held that a Board decision is arbitrary if it fails to consider an important aspect of the problem. And this is an important aspect of the problem that we raised in our briefs to the Board, that this is a violation of due process. But it's not a violation of due process, is it, if it's closely connected to the subject matter of the complaint and has been fully litigated? But we don't know what the Board decided on that issue because they didn't address it at all. So it's an unreasoned opinion. We don't know if there's a reasoned explanation for it or an unreasoned explanation. There's no explanation for the Board's failure to address... Wouldn't it be harmless error if there was no due process violation? It would be harmless error for the Board to have not addressed why it was not a due process violation. I don't think you can get there, Your Honor, because the Board has to address this problem. But let me get to that. They adopted the ALJ's... Any that they didn't agree with, they adopted in full the ALJ's findings, which means they adopted the ALJ reasoning that Judge Pan just referenced. Well, they didn't... It's not that they didn't grapple with it. They didn't specifically adopt the ALJ. They did more specifically. When they say, we adopt everything that the ALJ said, except... And then they have some footnotes. They adopted everything the ALJ said. So they did address it. They just addressed it in a way that they're entitled to address. Justice reports do it all the time with respect to magistrate judges. Again, Your Honor... And so that's the way they do it. We adopt what the ALJ said. Again, Your Honor, this was a very important argument that was raised before the Board. But this is a... They answered it. It's not important, not important. They answered it. They said, we adopt the ALJ's findings. Your whole argument to me so far has been they didn't address it. In fact, they did address it when they adopted the ALJ's findings. I don't believe that's a reasoned decision, Your Honor. And this Court... If we're going to adopt... This is going to be like a thunderbolt decision. If we were to say the Board cannot address or respond to arguments by simply adopting the ALJ's decision on all arguments raised, except the ones that it specifically disagrees with. Do you have any reason for that? They addressed some and they didn't... All the time. I understand, Your Honor. But this Court has held repeatedly that if it's an important argument and the Board fails to consider it, it can't be affirmed. It's arbitrary. But if they say, we looked at how the ALJ dealt with this and we adopted findings, that is considering it. I don't believe that's a reasoned decision, Your Honor, on an issue of this importance. But let me get to the issue that Judge Pan raised. The Board's decision found that not only were these individuals terminated not for the reason that was charged, but for their participation in a chat that discussed workplace conditions. Without discussing what workplace conditions, the Board determined to be protected activity. Isn't it obvious that the workplace condition at issue here that's tied up with the spreadsheet is the concern about getting underpaid? Well, there wasn't a charge here that being concerned about being underpaid. That's the spreadsheet. And that's what was so upsetting on the spreadsheet. And that's what they got upset about from Mr. Bendell was the spreadsheet had that line about developers underpaid 100%. But the charge, Your Honor... That's a workplace condition, right? The charge didn't charge that complaining about being underpaid is a protected activity. It was the content. It was the content of the spreadsheet. But we can't, Your Honor, we can't tell from the Board's decision. The workplace conditions that were discussed in that chat were... Mr. Bendell's firing, JA1053, Mr. Simard did not like that the spreadsheet conveyed the message to everybody that the programmers are all underpaid. That was his firing for the spreadsheet because it conveyed the message that all programmers, developers are underpaid. But, Your Honor, the Board's decision doesn't say which comments in the chat about workplace conditions were considered to be protected activity. All it needs is one. And if it definitely... The whole rationale for firing Mr. Bendell, the whole rationale that they were discussing was this concern about underpayment. It becomes self-evident. We don't require, you know, jot and tittle like that. But, Your Honor... There's one workplace condition that they were talking about. They were talking about lots of workplace conditions. Yes, but it included... One of them was concern about underpayments. And then Mr. Bendell got fired for the spreadsheet that included this line about underpayments. But it wasn't under... It wasn't complaining about underpayment that was the protected activity. It was salary sharing. It was the act of salary sharing that was the protected activity that was charged. Mr. Bendell did complain about being underpaid for months. That was not the protected activity. We got Mr. Zimmer himself telling us that what he didn't like about the spreadsheet was that it... Not that it was a spreadsheet of salaries, but that it conveyed the message to everybody that programmers are all underpaid. That was his... That's what led him for the charge for firing Mr. Bendell. But the workplace conditions... Is that a workplace condition? The work... It might be. But what's also workplace conditions is the discussions in the chat that actually were the reasons that were... Why these three individuals were terminated. They were saying, we're all leaving. We're trying to take another talented developer with us as we're leaving. They're saying, purge your computers. Nobody's disagreeing with that. Okay. The district court discredited as pretext the concern about purging computers. And I assume your company doesn't have a policy of firing people when they say, look what's happened. We're going to think about leaving. That's not all that happened here, Your Honor. They said, we're leaving. We're trying to recruit another developer to go with us. They're talking about... And these are highly skilled computer software engineers. They have access to the company's most sensitive IT infrastructure and data. They're trying to roll out a new restructuring of the development teams. And they now have three developers who are saying, we're on our way out the door. We're trying to take another developer with us. They're talking about purging their computers. One of them says, I'm downloading this confidential VIP document onto my personal Google account. What I'm trying to understand here is the stuff about purging, the district court or the district court, sorry, the AOJ and board both discredited as pretext. So that's just not the basis for their firing. If it's not the basis, if it was pretext, it's pretext. Not the basis for the termination of those three employees. And there was plenty of testimony that Vermont Info did not discourage people from looking for jobs if they were unhappy. Well, there's also plenty of testimony that Vermont Information Processing didn't discourage people from sharing salaries either. And the administrative... That's the workplace condition of underpayment. That was the trigger. But the administrative law judge's finding on pretext was basically just the AOJ disagreeing with VIP as to what level of risk should be tolerable. No. I think that's not fair. That is not fair. They said there was no indication whatsoever that anyone checked to see if computers had been purged ever. That that was not examined like you would if you thought somebody was purging computers. And the one person who said, let's purge your computers, boys, was Mr. Noble, whom everyone said was the hardest decision to make on termination. The other two didn't say it, didn't do anything. So they weren't purging anything. They weren't encouraging it. They didn't do anything. And their computers weren't examined. That is much more rationale than you are giving the AOJ and the board credit for. Your Honor, the VIPs had software installed to monitor the systems perpetually. Some bugs that may be placed in the network, either intentionally or inadvertently, could be undetected for some time. The testimony was we monitor these things constantly. The fact that we haven't discovered any problem right now doesn't mean there might not be a problem. And why should we be retaining software developers who need to be entrusted with this level of access to our IT infrastructure and data? If they're telling you- The stuff that's been rejected evidentially is a basis for termination. Mr. Simard said as to these three, if you have one or two people poisoning the well and telling employees that they're underpaid, it starts to resonate further and undermine the happy culture he holds to cultivate. Yes. And if you have- Reason for termination. That sounds like it's very interwoven with the spreadsheet and very much a protected activity. Your Honor, but it's not the protected activity that was charged. Someone says it's charged with an unfair labor practice. Let's say they're charged with preventing people. I don't want to- Talking about- I don't want to get the salary thinking is that, but talking about safety concerns on an assembly line and they're discharged. And that's an unfair labor practice. And the company comes in and says, oh, no, we discharged him because he was forming a union. Can the board then say credit that and say, well, either way, it was an unfair labor practice. Well, the company never said- I'm not saying you said that here, to be clear. This is a hypothetical. Right. No evidence of that was said here at all. But if you have a charge on one thing and then the defense evidence comes forward and shows, in fact, the termination was for a different unfair labor practice. Well, that's important, Your Honor, because- Can, if- I just want to legally answer this question, not a factual one, because this is a hypothetical. Can the board credit the unfair labor practice evidence put on by the employer? Well, hypothetically, I suppose the board could. But part of the problem here is we don't know what the board did here. And this brings us to another issue that was raised that was not addressed by the board. It seems to me, my understanding of your argument is that your client understood the ULP under consideration to be salary sharing and putting together a salary sharing spreadsheet. And in defense, your client said, we didn't fire them because of the salary sharing. Look at this chat where they were saying all these disloyal other things that we didn't like. We want to fire them because of stuff in the chat. And then the rug was pulled out from your defense when the board then said the chat that you relied on as your defense was the ULP, when it seemed to me that you were relying on the chat as a defense to the spreadsheet. Now, the aspects of the chat that were inextricably intertwined with the spreadsheet and salary sharing, I think, are covered by the case law that says it's not in the complaint. But if it's closely connected to the subject matter of the complaint, which was salary sharing and spreadsheet, and it's been litigated, that would be okay. That's kind of what the ALJ did. But this working conditions, workplace conditions, I think, kind of came out of the blue. And now they're relying on the chat talking about workplace conditions, and they don't even specify what workplace conditions they were talking about. And you didn't have an opportunity to address workplace conditions because you never knew that was an issue. When workplace conditions came into the picture at the NLRB stage, the hearing was over, the exceptions had been filed, all your arguments had been made. And then out of the blue, they were relying on workplace conditions, and you never had a chance to know what those were or what your arguments would have been against workplace conditions ULPs. And I thought that was your argument. Well, that is my argument, Your Honor. And you can't tell from the board's opinion what the workplace conditions were that the board found were being discussed in the chat that were protected. Is the board saying that it is a protected activity for developers to be talking about, we're all going to leave at the same time, we're going to recruit another developer to go with us, we're going to purge our computers, and we're sharing all of these discussions with a former employee who is now employed by a customer. Are those, is that a protected activity because it's a discussion of workplace conditions? We can't tell from the board's decision because they didn't provide any reasoning around that decision. So for the two, for Goon and Swift, who never mentioned purging computers. Well, they didn't object either. Okay. All right. So now you want to say is it unprotected activity to not object to another employee's statement? Mr. Dragoon was a team lead. If a developer is saying we're going to purge our VIP computers. That's not what he said. It's pretty clear in context that you're saying get rid of what we were saying about the spreadsheet because Mr. Bendella just got fired for that. But, and that's how it was, that stood and that's why it was all deemed pre-taxed by the ALJ. And so I want to get back to the point. Is it your position that employers can lawfully fire employees for discussing with each other their unhappiness at work, their desire to leave work? Hey, you want to come with me? Either I know a good employer or we could, you know, they could bring someone with them for a lot of reasons. We could go and set up our own shop or I got this great idea, this good company over here I heard is hiring. Is that permissible? My client certainly thought it was. It's a matter of law. And as a matter of law, there's nothing that says it's not. And that's not what was charged in this case. One thing that makes things an unfair labor practice is if employers aren't consistent in their treatment. And there was testimony that there was a program manager who said we don't object to people talking about leaving, investigating options, because we don't want someone here if they're unhappy. And so if you're inconsistent in how you apply something like that, then it would be. I don't think there's any evidence that there was any inconsistency in how this was applied. If you're trying to roll out a restructuring of the development teams, it requires everybody to be on board. And now you find out that three of your developers are not on board. And, in fact, I have a foot out the door and tend to leave and are trying to take other people with them. And are discussing this with somebody who's employed by a customer. And are talking about purging computers. And I'm sorry, R. Developers, software developers, talking about purging their employers' computers is unacceptable. I think the purging computers point, there's kind of a factual finding by the ALJ that that was protectual. But the taking another employee with you, can an employer fire an employee for trying to, I guess, poach another employee? Or is that protected? I don't see why that's protected. There's certainly no case law that says that that's protected. And, again, that's not what's. That's not protected. And if that isn't a working condition, that was the basis of this. I just think it's very unclear what the NLRB did was. Well, that's exactly my point, Your Honor. It is very unclear. And the board also did not address the other issue, which we raised before the board. Which is the act does not require an employer to allow employees unfettered use of the employee's IT resources, even to engage in protected activities. Unless the employee. Can I ask a separate question? So on this, just to stay back on this charging issue. Our precedent requires a showing of prejudice. And what you said in your brief is, well, we would have put on other evidence. Or some of you said would have called other witnesses. But there's no specificity at all. As to what you would have either not done or done. What is your best case for a finding of prejudice being based simply on statements that we would have done things differently? Without specifying substantively what story you would have put on. I think to begin with, Your Honor. If the charge had been that these three developers were unlawfully terminated because of their participation in this group chat. VIP would not have relied on the group chat as a defense to the charge. It would have put on an entirely different defense. And it would have zeroed in more on exactly. And frankly, there is evidence. What evidence would you have had of their disloyalty, their desire to recruit someone to go with them other than the chat? We would have brought in the other employees that were parties to their earlier chats that were discovered after they were terminated. And this occurred weeks. You can't rely on stuff that you discover after they're terminated to prove the reasons for termination. We can absolutely. People knew at the time they made the decision. To show their motive and what these individuals, how truly disloyal they were. If that's not evidence that the decision-maker had at the time of the decision, you can't rely upon it. There's no after-acquired evidence theory here. No. Well, it doesn't have to be after-acquired evidence. If we're trying to prove that these individuals, we're trying to extrapolate now from what we do know, which is we can see in this chat. What did the decision-maker know at the time the decision was made? And that was all from the chat. And we knew that they were disloyal. From the chat. From the chat. So I'm really trying to understand for your prejudice showing here. If it seems to me the very thing that you want to rely on to demonstrate, that you would have relied on to demonstrate a different reason for their termination is the very chat that you put in definite. Well, it's not a different reason. It's the very reason that management discussed and the reason that VIP has advanced all along why these individuals were terminated. Because they were disloyal. Because they couldn't be trusted. You advanced it all along. You put your evidence. I mean, that's your point. That was our affirmative defense. It wasn't the spreadsheet. It was this disloyalty. But if we had known that the chat itself was going to be deemed a protected activity. If it's going to be deemed to be, that would be. And the board specifically found that VIP monitoring and investigating this was not a violation in and of itself. So we found information. We relied on that information to fire these individuals. If we would have known that this whole chat was going to be considered the protected activity, we would have gone into a lot more evidence about exactly how disloyal these people were. Again, I think we're going to show prejudice. You have to show what evidence you would have put on for their termination that was before the decision maker at the time. And we know the decision maker tells us exactly what he was relying on here. Right? People poisoning the well. And you're talking about restructuring. So this is a particular point in time of sensitivity. All right? So you've got that here. And you put the chat in. So it seems to me that it's not that you want to put on more evidence. You want to have a board finding about this legal question of whether what they said in the chat was protected or not. Is that right? That's certainly something that the board ought to decide. That's a very different argument. Your argument in your brief was we would have put on different evidence. But it seems to me the basis for the decision for termination is right here, Mr. Simard's words. And that was from the evidence from the chat. And so your argument seems to be in response to Judge Pan, not that we would have put on new evidence, but that the board needed to make a new legal finding about whether that was protected or not. It's both, Your Honor. It's both, Your Honor. If we had known that this chat itself was going to be considered the protected activity, and as Judge Pan has pointed out, we don't know exactly what about that the board is saying was the workplace conditions that was the protected activity. We don't know that. But had we known that, we would have not relied solely on, we didn't fire them for creating and disseminating a salary spreadsheet, because there's no evidence that these three actually did that. What we fired them for was their participation in this chat where they made these comments. I agree with that. I'm sorry. I understand. Why isn't it the case that you wouldn't, if you had known that the chat was potentially a ULP, you would have parsed the chat more? Because what I'm confused about is which parts of this chat are allowed and which parts are not allowed, and, you know, what are they relying on? It just seems to me that it is unclear. It's not just the chat, because there's stuff within the chat that is protected and stuff that's not. And if you had known that this was part of the inquiry as to what was a ULP, wouldn't you have parsed the chat and figured out what was allowed, what was not allowed, and maybe crafted your defense in response to that? And also, I believe what happened was when you saw this chat, you also pulled up performance evaluations of each of these employees, and might you have relied more on performance evaluations now that, in combination with the parts of the chat that were not protected. It just seems to me that if it was never on your radar screen that parts of this chat were going to be part of the ULP, you just would have done your defense differently. Absolutely, Your Honor. We would have had a completely different defense. I don't understand this. I'm still not getting this. If you don't get to just parse out the chat, the chat's going to be turned over to them. They're going to have it. It's a really bad strategy, everyone knows, to just pick your favorite pieces and put something in, knowing that the other stuff's going to come in from the other side. So this chat was coming in, and it was in. And the performance evaluations were not anything that Mr. Simard relied on in making the firing decision. We have that testimony, right? And so I don't know why those would have been relevant. It seems to me your argument is not an evidentiary one. It is the one that Judge Pan was referencing, which is there's a lot of stuff going on in this chat. Right. What was protected, what was not. And we want to point to the parts. When Mr. Simard said that they're poisoning the well and destroying the happy culture at the workplace, and I take that, the I'm unhappy, want to leave is poisoning the well. There needed to be a legal ruling by the board. Two things. Number one, Mr. Simard also testified that he was very disturbed when the statement by, I believe it was Mr. Swift, in his performance review was read at the manager's meeting where Mr. Swift said, I have no loyalty to VIP. In the context now of this chat, that was very concerning. Was that right before this event or when was the date? That was in his last performance review. How long before this event? I don't know, months. But it was something that hadn't come to Mr. Simard's attention until they were focusing on these chats. But this is exactly the problem. You know, VIP is looking at the- Mr. Simard, as to what was protected or not protected? I think at a minimum we need that, Your Honor. At a minimum we need that. Couldn't you have focused your defense on the parts of the chat that are not protected, like trying to poach another employee, combined with the performance review, lack of loyalty? I mean, it just seems like you could have crafted something if you had known that parts of the chat were going to be ULPs. You could have figured out which ones were not protected and tried to emphasize those more. It just, I don't know. Well, we could have- It's very unclear to me, as a not a labor expert, what parts of that chat reflect protected activity, what parts were not protected, and what's a working condition in the context of this chat. I don't understand it. And this is exactly the problem, and I'd like to leave the court with this. This is the problem that VIP was confronted with. We have employees who are engaged in unprotected activity that makes VIP feel a lack of confidence, a lack of trust in these developers with the access that they need to have to VIP's infrastructure. But these employees have also engaged in a protected activity of salary sharing, and VIP recognizes that. So what is VIP supposed to do? So they did the only thing they could do. They fired these employees for the unprotected activity, and then they went to their workforce repeatedly and said, we do not have a policy against salary sharing. You are free to share salaries. That's not the problem here. The problem here with Mr. Bendell is the way he did it, publishing this unattributed spreadsheet- I remember that from the record. I suspect that my colleagues do as well. Is there anything in the record about VIP firing people in the past for disloyalty or disparagement of management? And this is not a totally hostile question. It's just whatever. Answer it accurately. I think the testimony in the ALJ hearing was VIP had never seen anything like this before. Oh, okay. And as I understand it, on page 29 to 30 of your brief, you go through at least three different strategic, tactical things you would have done differently if this conduct had been charged before. It was too late. Am I right about that? That's correct, Your Honor. Can I now go to the totally different topic, Bendell? And you say that he was fired not for the spreadsheet's inclusion of salaries, but he was fired because the spreadsheet was misleading and confusing. Right? And a little bit more, Your Honor. It was the timing of the whole thing. Mr. Bendell had had his meeting with his supervisors the day before where they talked to him about the restructuring and his role in the restructuring. And he had been given a free agent role because management was already concerned that he had a foot out the door and he might not be sticking around. He didn't respond well to that. He used a scatological term to refer to how those meetings went. They didn't go well. So he was already on thin ice. They didn't make any decision about what to do about that at that point except go forward with the rollout of the restructuring and then decide, based on his response to that, maybe we need to revisit Mr. Bendell. They have the meeting on the morning of the 16th to roll out the restructuring. Immediately after this meeting, this spreadsheet appears. And it's brought to senior management by a supervisor who says one of his developers has come to him and says, what is this? He doesn't know what it is. The manager doesn't know what it is. They're wondering if it's a VIP initiative. Management goes into the system. They see that Mr. Bendell created this the day before. They can see that it's not clear. There's no attribution about where it's coming from. It's on a VIP active document on a VIP server. They don't know exactly how this has been shared. But they also can see that he has hardcoded it so that no matter what data gets put into the spreadsheet it's going to produce this result that says 100% of developers are underpaid. They say Bendell is trying to disrupt the restructuring because he doesn't like it. He doesn't like the role that he was in. We're going to take down this spreadsheet while we investigate it. And again, the board didn't find that taking down the spreadsheet was an unfair labor practice. And we're going to fire Mr. Bendell. And then we're going to go to our workforce and we're going to tell them, look, salary sharing is not the problem. You can share your salaries. We assume that's what you're doing. The problem was what Mr. Bendell did with this document. That's not okay. And again, we briefed this issue. Just because of that one statement that they're all underpaid because he didn't make that statement. It was somebody else who added that. No. Mr. Bendell made that. And the ALJ found that management reasonably believed that Mr. Bendell did that. That he's the one who had hard-coded it. Is that the only problem with it? No. That's not the only problem with it. The biggest problem with it was the timing of it. It was a VIP document. You just said timing. So no one was allowed to discuss salaries during the rollout. To put out a spreadsheet. No, I'm asking the question. You just said timing. Of course, people can discuss salaries. Including during this rollout and restructuring. Absolutely, people can discuss salaries. That's not the problem. The problem was, all of a sudden, instead of focusing on the rollout, developers are looking at this spreadsheet. They don't know if it's a management initiative. They don't know what it is. They're confused about it. Which is why it came to the attention of VIP management. And then they can see that it's got inaccurate information on it. It's clear that this is Bendell's. Some of the salaries were inaccurate. And the way that Bendell had programmed it, so that no matter what data was put in, it would produce this statement that 100% of developers are underpaid. Is it programmed? People were just typing information in. You look at it, it's not mathematically changing. Someone just typed in that statement. Bendell hard coded it. So no matter what data was put in, it would produce that same result. Can you explain that a little bit more? There's a screenshot of the spreadsheet in the record. But it's a screenshot. And as you know, with spreadsheets, each cell may well have a formula that leads to what you see on the screen. You don't always see the formula. What was the hard coded formula in the spreadsheet that caused it to always show that 100% of developers were underpaid? I'm not a coder myself. I can't provide a technical explanation for that. But what I can tell you is there's undisputed evidence on the record that management went into this spreadsheet and they could see that Mr. Bendell is the one who had hard coded this. So no matter what data went in, it would produce the same result. That's what management saw. You lost me almost to the game because you're not a coder yourself. I'm not a coder either. I can barely turn on my computer. I'm definitely not Java coding some software program. But I know that with a spreadsheet, you can put in cell 1 plus cell 2. And if that's the formula for cell 3, then if cell 1 is 1 and cell 2 is 2, cell 3 is going to say 3. And you can put in a formula so no matter what goes in, 2 plus 5 is going to be 6.  I don't know what the formula was. But that was the conclusion of management is that that is effectively what Mr. Bendell had done. And by the way, there's other evidence too that contemporaneously with this coming on, there was another developer who was complaining that she was trying to put her salary in this spreadsheet and Bendell kept messing around with the formula. So this is what's going on while people are still... Did management know that before they fired Bendell? No, they found that as part of an investigation. I'm going to go back to this because it matters to me. I hear you saying it shouldn't matter to me and it doesn't matter to you, but it matters to me. If the bottom of the spreadsheet had just had a cell that said, hey everybody, in my opinion, we're all underpaid. That I think would not be especially confusing or inaccurate because it's an opinion and an opinion can't be inaccurate. It wouldn't be confusing, it's actually not at all a subtle point that that person would be making. But if on the other hand that cell is something that a viewer of the spreadsheet thinks, okay, this is the product of a mathematical formula based on whether the salaries that are entered are high or low, then I think it's pretty confusing. They think that that cell could possibly say something other than 100% are underpaid. So you haven't given me anything to help me think that it's the second of those scenarios and not basically just a bumper sticker that says we're all underpaid. Can you give me any? I can tell you that management, and these are people who know all about entering data in spreadsheets and how to make spreadsheets. Their conclusion was that what Vandell had done was the second scenario. You couldn't have a mathematical formula computing underpaid status unless you're comparing it to other salaries. Was there any input anywhere in this document that showed what other developers in other places are getting paid? Well, that's part of the problem. No, no, no. This is a yes or no question. Was there anything in this spreadsheet that would allow a computer to then make a computation but always have this one number come out to compare these salaries? No, Your Honor. Absolutely not. It was just typed in. It was a bumper sticker. You can't decide other underpaid unless you have a comparison. There was absolutely nothing in this spreadsheet that said underpaid as compared to what. You're absolutely right. This is Chris Vandell voicing my opinion that 100% of developers are underpaid. It had no attribution. It wasn't clear where this was coming from, what its purpose was, and developers now are entering their confidential salary information on this spreadsheet. It seems to me that even if you had a colorbolt argument as to why what your client did was justified, that doesn't mean that there wasn't substantial evidence to support the ALJ's determination which relied on credibility and evidence in the record that that's not really what was going on here, that Vandell was dismissed because of the spreadsheet and all this other stuff that you're saying the ALJ found it was pretextual or not really what happened. There's substantial evidence to support that based on the timing of his firing, etc. Even if you do have a colorbolt argument here, that's not the analysis before us. We just have to determine if there's substantial evidence for the ALJ's contrary finding that that's really not what happened. Everything you're saying is pretextual and what really happened was you were unhappy that he created the spreadsheet, disseminated the spreadsheet, you fired him for it, and all this other stuff is actually not the real reason. Thank you, Anna. With respect to Mr. Vandell, this is where you have to look at what the ALJ actually found and what the board actually found. VIP has never disputed that they fired Mr. Vandell because he put up this spreadsheet. That's exactly what he did that led to his termination. What they have disputed all along is that the termination was motivated by any kind of a retaliatory animus towards salary sharing. This is the important distinction. I think it's a distinction that the board made when they said we are not adopting the ALJ's finding that merely taking down the spreadsheet is evidence of retaliatory animus. They're not relying on that. Where is the evidence that VIP was motivated by retaliatory animus? Does it have to be retaliatory animus for those reasons? Just firing somebody for doing a salary sharing spreadsheet, that's protected conduct. The spreadsheet was salary sharing. The spreadsheet was a spreadsheet. Salary sharing is salary sharing. The spreadsheet was a form of salary sharing. Everybody puts your salaries in the spreadsheet. They're sharing their salaries. Firing somebody for that spreadsheet is a ULP. I guess under right line, you could say we would have fired him anyway for these other reasons, but the ALJ said those other reasons are protectable and we don't credit it. This is why we need to get to what the other reasons were. I think that's a difference. The chat is really not about Vandel. It's about the trio. That's different. Vandel, I think, is very straightforward. ALJ says you fired this guy because of salary sharing and you admit that it was salary sharing. Under right line step two, you have to say we would have fired him even if he hadn't done the salary sharing. The record is very thin on why you would have done that because you had not done so even after he had these problematic interactions with his supervisors. You hadn't fired him. If this spreadsheet had had nothing to do with salary sharing but it had been sports betting or something else that's not protected, it would have been the same thing because he was disrupting the restructuring with this spreadsheet. I understand that the ALJ discredited you. That's what you say, but it was because it was salary sharing. The ALJ relied on taking down the spreadsheet which the board said is not evidence of retaliatory animus. The board didn't say what other evidence of retaliatory animus the board found. What the ALJ said is shifting explanations. I thought it was your burden under right line step two to say that you would have fired him anyway even though you did fire him in part because of salary sharing. I thought right line says you're supposed to now prove despite that we were going to fire him anyway. The ALJ said no you weren't. To make a prima facie case the board initially has to prove that it was motivated by retaliatory animus. You conceded that it was because of the spreadsheet. But not because of salary sharing. I think we have one more question over here. You said a few minutes ago that the management of the company understood the 100% underpaid sale to be the product of a coded formula. Where can I find in the record that that's what management? I don't have that site in front of me but it certainly is cited in our briefs in the statement of facts. It would be in respondent's exhibit 40. On rebuttal you can bring that in. I'll do that. Thank you very much. Thank you. Thank you. Mr. Sutter? Hello your honors. This is about as straightforward as classic cases you're likely to encounter. This case involves four employees. I saw that in your brief. You've already heard two judges who don't. You said in your brief this is the most straightforward NLRB case ever. We could decide this in our sleep. You've already heard two of us express serious skepticism. Do you want to address the charging issue? Sure. Unless my colleagues prefer something different. Maybe the simplest way to do it is there was the issue as you noted of Bendel and the issue of the trio. I didn't hear the court. Can you tell us in that chat what was protected, what was not, and what was a working condition? Your honor, the board found that what the employees were fired for was discussing salaries, working conditions, and discussing Bendel's firing. What are the working conditions in that chat? In that chat? Frankly, I think it's the salaries issue. I think the board probably repeated itself in that chat. Can you first give the JA, pull up the chat, and say what exactly was protected and what exactly was not protected? Okay. Unless you have a photographic memory, I think you're going to need the JA for this. I can, actually. There are different parts of the chat. For example, talking about quitting, talking about job hunting, that's not protected. I want to follow you along word for word. What gives you the JA? This is in the SJA. Oh, no. I'm sorry. I have it in the SJA, but I have the JA numbers. I've got 1111. I have 1249. Maybe 1111 might be a better one. No, no. It might not be. What page do you want to start on? As I have it, it starts on 1158, the chat, and it continues through 1201. So you start at 1158? Yes. The chat starts long before that. The chat starts, it's Exhibit 14. It starts with, Why is Caleb not lead of WMS? What's all the stuff before it? That also looks like chat. Is that not a relevant fact? Let me look. It looks like there's a different chat. That's Exhibit 10. That starts at 1132. Right. So 1156, 57, that's a different chat. That's Exhibit 10.    I'm not sure if it's Exhibit... I think it may be Exhibit 12, actually. And then even the one that you said starts at 1158. I could be wrong, but it looks like that chat in the two lines includes Bendel, and a lot of Bendel statements in the chat. But I thought the chat that they were fired for was the chat that happened after Bendel's. No, Your Honor. Bendel was fired in the course of the chat. The chat that they were fired about... Bendel was literally chatting with them. Yeah. Well, he disappears. The others find out. At some point in that chat, one of them says, Oh, my God, Bendel's account has been locked out. What's happening? And the others go, What the hell? And then later on, they say, It's official. Bendel's been fired. And that's where you have the perjure computers comment. So all of this happens. What happens is the spreadsheets... Bendel and Noble have their conversation about the spreadsheets on one day. I think it's the 16th. What page is the perjure? Because, again, I originally had 1249. That's because of the perjure computers. There may be a better chat that you're describing, a more relevant chat. They also... The perjure computers is at 1197. It's also at 1249. Yeah, that's an affidavit from somebody from beginning. Okay. So this thing on 1197, by this point, Bendel is gone from the chat. Yeah, if you read, actually, the page before, at the very top, Dragoon says he was actually fired. Okay. And this is the chat that these other three were fired for? Yes. Okay. And then going to Judge Pan's question, and thanks for helping me get on the right page. I may have been looking at a copy of the page. What's the protected activity? What's the unprotected activity? Well, just one point to start. I've heard Mr. Ellis in the court say the chat was protected. No. There are statements in the chat that are unprotected. That's what we're asking. Mr. Ellis certainly said that if we had known that the chat was the ULP. Our question to you is what parts of the chat are protected and which parts of the chat are not. The parts about salary sharing, about where they discuss salaries, where they discuss the spreadsheets, and where they discuss Bendel's termination. That's what the board found. They were fired for discussing their salaries, the spreadsheet, and Bendel's termination. Is generally discussing somebody else's termination protected conduct? No, but discussing somebody's termination for engaging in protected conduct certainly is. And conduct that you have engaged in yourself because you participate in the creation or dissemination of that spreadsheet. So going to page 1196, the third line from the bottom says Jesus F in blank. Is that protected activity? Can you fire someone for saying that? You certainly can, Your Honor. But not when it's intrinsically linked and part of an entire discussion of salaries and of a guy being fired for protected conduct. This is what VIP tries to do. They basically try to sort of gerrymander in and out the sentences that are not protected like saying you're job hunting. That's not protected. If we could just stick with our question. Is the chat portion that says let's take Fung with us. That's a really good programmer. Let's all quit and let's take him with us. Is that protected? No, on its own it's not. But in the context when they are talking about Fung doesn't get paid enough he should come with us. The board recognizes. What are working conditions? In this discussion of all these different things what's the working condition within this chat? I think like I said the salaries and the fact that one of their colleagues just got fired for engaging in protected activity which they know is illegal and that they are now afraid that they might get fired for the same reason. But you're just inferring that. I guess the issue is when the NLRB issues this opinion all of a sudden it's injected working conditions into the discussion where I think the position of your friend is we never knew working conditions of the ULP we had to contend with. And you're saying I assume that the working conditions are the same ones as the salary. But how do we know that? This is a pretty extensive chat that I'm looking at. I don't know if it's the same chat or other ones and things are like F management all these different things and I just don't know what the NLRB held was appropriate or not. Once you inject working conditions if there's never been any discussion of working conditions in the entire record I don't understand where we are. When the board adopts the LJ's finding and says they're talking about salary sharing ALJ didn't rely on working conditions. Working conditions is whatever the ALJ discussed. Whatever is in there. So anything that ALJ discusses in any NLRB came about working conditions? The ALJ didn't rely on working conditions. The ALJ relied on people complaining about being underpaid which is undeniably a working condition. Right? It is a working condition but I don't know if there are other working conditions in the chat that could form the basis of NLRB's finding. There's never been any discussion of working conditions so I just don't know where that comes from or what it's referring to. The only working condition that the ALJ discusses is the fact that they're underpaid and the fact that they're upset and they feel like they're going to get fired themselves for engaging in protected conduct. If the board says working conditions it says that based on things that the ALJ found it's not inventing a new working condition. So the NLRB said, the board said that they were chatting about I'm just paraphrasing here I think it was salaries and then working conditions and Bendell's firing. And that was the protected activity. But if VIP never knew that working conditions was a part of the analysis how is that not arbitrary and capricious to inject it after the record has closed they've already filed their exceptions and all of a sudden you're relying on something they never had a chance to address. The only working conditions discussed by the ALJ are the fact that they're unhappy with their salaries. The board didn't say we're relying on some other statements. Shouldn't the board have to spell out what working conditions they're relying on because the ALJ didn't rely on them and there's never been any discussion of working conditions before in this record. Working conditions is an extremely wide term. Exactly. And I don't think when the board says working conditions it relies on what's in the ALJ's opinion that relates to working conditions namely the fact they are underpaid. So I guess the thing that troubles me about this record is it seems to me that the general counsel said the ULP that we are going to be talking about is salary sharing and the creation of a spreadsheet and the dissemination of a spreadsheet. The ALJ did take that a little bit further but I think probably permissibly when it said chats about the spreadsheet that's been extricably linked, it's been litigated that's the ULP. And I think the position of VIP is you told us it was about the spreadsheet so our defense was look at this chat, look at all these things they were saying and all of a sudden you pull the rug out from under us by saying our defense which was in this chat was the ULP and then you don't even tell us what it was in this chat that you're actually relying on because there are parts of it that could be as the ALJ said inextricably intertwined but other parts that are not and it would be unfair for you to rely on the things that are not inextricably intertwined and we didn't have any opportunity if you did rely on the things that are not intertwined to address them but we don't know what you relied on because all you said was working conditions. I mean that sounds pretty compelling to me. Well okay I think even okay I'll get back to your question but I just want to make one point even if let's say the workplace conditions was a problem I would argue that it's still harmless error because the boards still found based on their chats about their salaries and being underpaid and Bendel's termination that that was the protected conduct within the spreadsheet so even if UABIP had the chance to defend against that Could they have rejiggered or changed the way they defended this case if they had known that working conditions were a part of it because then they might have tried to ascertain within the chat what's protected what's not what's a working condition and then they could have shifted their defense to address the boards or the ALJ's concerns if the concern was about working conditions didn't they have a right to know what the concern was and what the working conditions were so they could address them or change their defense strategy because then they could parse this chat and say which ones are the ones you're concerned about we're actually relying it seems that nobody's disputing that it would be a firing offense that's not protected to try to poach another developer and have them leave the company with you they could have said we were really the most concerned about that and combined with the performance review like they just could have re-emphasized or changed the way they approached this if they had known that your concern was working conditions and then they would have tried to figure out what the working conditions were that you were concerned about and they could have adjusted their defense accordingly every point you just made your honor is a point that they made in their argument it is evidence that they put forth so I think that goes back to the if the ALJ had credited them if they had changed their defense a bit and said we're the most concerned about the poaching of other developers like this is something that is really not acceptable to us you know we can't have people within our organization telling other people in our organization to quit that was the most troubling thing to us and if the ALJ credited that that would be a permissible firing it would not be a UOP actually your honor this is where I would push back if you make comments that are within a discussion a protected discussion and you make comments that fall out of there your discussion does not lose its protection the whole thing I thought you would agree that's not protected conduct in isolation if VIP comes across a chat and it's these guys saying hey we're going to quit and we're going to get this guy to quit with us let's all quit together unprotected no doubt if they say we're not getting paid enough this is ridiculous hey he's not getting paid either we should all leave together and by the way we're circling the spreadsheet all of that then it's inextricably linked and you can't just separate one from the other so these three employees could have said anything no there are things that you can say that are so egregious that they will cause you to lose the protections of the act what's an example off the top of my head I couldn't tell you management no no it's under the Atlantic steel analysis things that are too serious that they will cause you to lose like for example this isn't saying something but if you start if you're talking to your employer and you're arguing back and forth and all of a sudden you hit the employer you lose the protection of the act doesn't matter what you said before what if you use hate speech toward the employer what if you say toward the employers F these pieces of blanks so hard if you say it to their face maybe but not when you're talking amongst yourselves that's all I'm just curious about this because if I'm an employer and I think that everything's going fine with this employee and then I find out that they're saying F which is what you read so hard and I'm disturbed by this and I want to fire them I can't yes you can if that's all they said but if it's in the middle of a discussion what the board recognizes and I think this court knows is you don't when you're talking about protected conduct that doesn't mean that you don't inject things you know conversation doesn't work like that you don't just say okay now we're just talking about protected conduct and we're not going to say anything else and now we're done now I'm going to say F this employer so hard can you fire someone for disloyalty yes but not if you associate disloyalty complaining about your salaries so if someone is advocating for let's say unionize, unionize, unionize independence of whether or not they are in favor of a union you come to the conclusion they are a disloyal employee not disloyal because they want to unionize but disloyal because they say things like F these pieces of F so hard I don't see how you get to get out of jail free card for saying extremely disloyal and vile things about your employer just because a minute before you were saying unionize, unionize, pay us more, pay us more that's a slightly I don't know how the board would rule in that situation because you're talking about the one act where on one hand this guy is doing this and then maybe the next day he says F these people so hard excuse me in this case it's all intertwined it's all part of the same ebb and flow of a conversation there's a lot of case law out there that says we do not the board doesn't enforce Emily Post rules there can be a lot of unpleasant language in workplaces a lot has been tolerated picket lines, workplaces break rooms and so it's a very very nuanced analysis before someone can get fired for using obscene language it's really very nuanced and context specific and there is a lot of precedence on that so we can't just sort of pick up a transcript and say oh curse word, my ears hurt you can be fired, is that your point? I wish I was as articulate as you are Judge I agree with that that both Judge Millett and also what Judge Millett suggested is correct that when you are engaging in protected speech you can use four letter words but that doesn't answer the question of whether this speaks itself of protected speech or if this is a sign of disloyalty separate from wanting higher salaries when you are in the midst of protected activity and you interject other things like that those become protected by association you can't just carve them out don't talk over me is this just a finding by the ALJ whether or not it's protected or not is it just for the ALJ to make a finding as to whether or not it's protected or not depending on the context we're debating in a vacuum here it's context specific sometimes it's protected, sometimes it's not depending on the context, isn't it for the ALJ to make a finding as to whether or not this is protected or not based on the context no your honor, I mean yes my point is let's take Fung with us we're all going to quit, let's take Fung with us isn't it up to the ALJ to determine whether or not that's protected or not based on the context I think it would be nice I'll agree, it would be nice if the ALJ had done so what I'm saying is if they had had an opportunity to know what the concerns were within the chat they could have honed in on, for example let's take Fung with us and said that's not protected and that's why we fired them and then the ALJ could then decide that was protected or that wasn't protected or whatever but none of that happened because they didn't have the opportunity to know what was it within this chat that was allegedly a ULP or not because that wasn't the focus of the complaint or even the ALJ's finding which extended the complaint a little bit, probably permissibly but then the NLRB went even further in an area that they didn't have a chance to address which is working conditions even if that was true and the ALJ should have made that finding ultimately it is a harmless error because as Judge Millet said but was it harmless if the ALJ didn't have a chance to address the argument, for example that this is the thing that we relied on let's take Fung with us it's not harmless if the ALJ never was presented the argument because they didn't know that they were going to have to parse the chat like that it is harmless, Your Honor, because under board law when you interject things like that within the context of protected conduct you do not lose the protections of the act I thought we just agreed that the ALJ would have to decide what is protected and what is not depending on the context No, then I'm sorry that's not what I meant what I meant is that the harmless error in this case would be as you were saying, the ALJ didn't have an occasion to pass on it therefore that's what they're complaining about the harmless error intervenes because even if the ALJ had passed on it under board law it is undeniable and well established that you can say, F these pieces of S so hard or that kind of stuff in the context I'm sorry, counsel, you got up, I said is that protected or not and you said that is not protected you can't say let's take Fung with us, let's have Fung quit I thought that's where we started and now you're saying as a matter of law that would be protected what I said, Your Honor, is that in a vacuum making those comments, if they had found a chat that said just that, that is not protected when I asked you this earlier, in this argument about this case I asked you is that statement protected or not and you said it is not, but now you're saying it most definitely is the statement is protected by association because it occurs within the context of protected conduct I do apologize, Your Honor I do remember saying in a vacuum, maybe we misunderstood each other I sincerely apologize but I don't believe I've changed my position, it's certainly our position in the brief is that even if statements like that on their own are unprotected when they are made in the midst of protected conduct they do not cause the employees to lose the protections of the act and I apologize if I said anything differently in the context imagine there's a union election there's two competing planks, there's the incumbents and then there are challengers who say the union is doing a terrible job and they're in a break room the employees are in there one plank is arguing that the other the incumbents are doing a bad job and the incumbents are saying no, we're doing a great job and in the midst of that kind of hustle bustle and debate about the election one of them says some people here are not paying their bills and as it happens someone on the other side's husband recently passed away and they've been forced to raise money for the funeral expenses and then that same person who said that nasty thing also said some people need to focus on their kids rather than the union and a few days later the incumbent person's son had narrowly survived a stabbing these things are right in the middle of the election speech back and forth this is from a case I know that case argued in front of you why was it unprotected speech there but you're saying in the context of this chat they could have said basically anything in that case if you recall the person who made those statements what the board found was that he started by talking about electioneering and then he veered off onto something that had absolutely nothing to do and then got into a back and forth specifically with this person where he said those things that's where they're talking about Bindel and Bindel shouldn't have been fired and then they veer off into hey, let's go coach one of this company's employees when we leave and also let's coach one of the employees' customers no, no, no, no they never said coach the employees' customers they talked about calling up a former colleague of theirs who works now for a customer of the VIP and telling him about what happened there was no poaching of customers or anything like that I still seem a bit disillusioned and basically sanitized the company's relationship with that customer I can certainly we have a situation with the McClam thing but it seems like the argument that the board made there is not consistent with the argument the board made here the argument in McClam is not consistent with the argument here imagine that someone said those managers should pay us more and that's protected those insert racial epithet should pay us more and then the employer fired them for being racist I think that's a fair firing right but if they say those MFing employers should pay us more that is protected if they say we're underpaid this is crazy what's going on my friend Joe over here he's really underpaid too can you believe how underpaid he is and they go wow if we get out of here and get other jobs let's bring him with us protected by association it's all about the spark about this the reason they're talking about this is that they're frustrated with their pay the reason they're saying F these MFers so hard is because they just fired a colleague for engaging in protected conduct the reason they're saying I don't care about these people anymore is because they're complaining about their income and they feel mistreated at some point it becomes a little attenuated because the original ULP is salary sharing disseminating a spreadsheet and then it leads into we're all underpaid which I can kind of see but then it leads into let's take other people with us if we quit at some point it's a little attenuated from the original ULP I can understand yes at some point there's going to be a line but if it occurs within the same this is the main point here it's fairly litigated if it's inextricably intertwined it's fairly litigated I don't see why you can rely on that if you didn't say so I don't know whether you relied on it or not because you didn't say so what the board relied on and it said so is the fact that they were complaining about their salaries and the working conditions what does that entail poaching an employee is not a working condition I think we can all agree on that it would have been fair to fire them for wanting to poach what does poach mean I'm sorry you're right we got sidetracked with the poaching it was talking about leaving with another employee if we get out let's take him with us interfering with the relationship between another employee and management if that's not one of the things if they had said to the ALJ that's why we fired him that would have been lawful no your honor if they had said that in a vacuum yes in the context of this case where the ULTs that are under consideration do not involve interfering with another employee's relationship with management it wasn't the ULP that you're saying it wasn't a ULP because we were actually concerned about this the interference of our relationship with another employee if the only ULPs that are under consideration are spreadsheet creation perhaps if they had evidence that they separately from all this were actively trying to talk to this guy and leave with him but just a statement thrown out in the midst of a complaint in the midst of protected conduct no that remains protected again it's not protected in and of itself it becomes protected by association I guess my point is that they might have had a different defense like if they had known that you were going to go in the direction of working conditions they would have wanted to know which working conditions are you talking about does it include this other employee and then they could have made an argument we weren't focused on the ones you're concerned about we were focused on these ones and it would have been lawful for us to fire these people based on this other thing but none of this was litigated none of this was considered because they had no idea that working conditions were a thing in this case and that's where I come in and say this is harmless error because even if that was true I would still be coming here and saying under established board law when you just throw stuff out like that in the midst of a conversation that may not be protected in and of itself in a vacuum you can know whether it's harmless or not because you don't know what their different defense would have been if they had known that working conditions were a thing you're basically saying there's no scenario in which they could have come up with anything that possibly could have made any difference but you don't know what they would have done differently I'm just giving you an example of something they might have done that seems plausible to me but there might be lots of things I don't even know about but you're saying no matter what it was it would have been harmless and I don't know how you can know that they would also have to show us to actually put forth something that they would have provided to support that they would have had to provide evidence or put forth evidence that they would have provided that is somehow different than what they already put in it doesn't have to be different does it? they could have changed the litigation strategy it's the same chat that's in evidence but they could have emphasized something different within it they could have said something in the chat combined with the performance review that was evidence that they didn't emphasize I don't know I'm just saying they could have had a different strategy I thought that was their strategy they talked about Noble's performance review they brought all of those things in I think we're talking about this at this point do you have any more questions? thank you very much counsel may I just on the hardcoded there is an answer to your question your honor the problem is it's a little awkward the spreadsheet was introduced into evidence the actual excel spreadsheet it was not admitted into the record the court reporter included it inadvertently within the rest of the evidence and it is actually part of the record that we have in the board's files I don't want to say anymore since it's not part of the formal record but there is an answer to your question I'm sorry that leads to more questions how is the spreadsheet for the unfair legal practice with regard to Bendel they omitted to admit it they introduced it and they didn't ask to admit it the company yeah they introduced it they questioned him about it the burden would be on the general counsel to prove the case wouldn't they need the spreadsheet as part of the evidence to prove the case the general counsel relied on photographs screenshots that you have seen that are part of the record the screenshots were admitted the original was introduced but not admitted ok thank you for that clarification like I said the answer exists thank you thank you very much thank you thank you Judge Walker to your question the citations in the record to the evidence how management looked at the spreadsheet and what they concluded I can give you the citations the joint appendix 1246, 841, 842 1067 and 1053 thank you the discussions of leaving and taking Fung with us occurred before they found out that Bendel had been fired it had nothing to do with Bendel being fired and the discussions that were taking place in the chat at that time weren't just about salary they didn't like the restructuring for lots of reasons they thought management didn't know what they were doing they objected to the restructuring it wasn't just the salary the argument that is being made here by the board's appellate counsel even though the board didn't make this argument they can say whatever they want but as long as at some point in that chat they mention salary sharing everything automatically becomes protected he said you have to switch to the Atlantic Steel analysis so let's be fair especially because we don't know from the board's decision what are the workplace conditions that the board found to be protected is it the board's view that the discussion about recruiting Fung and taking him with us is a discussion of workplace conditions we simply don't know thank you
judges: Millett; Walker; Pan